| | | |
|---|---|---|
| **LAURIE D. ZALEUKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  4:19-CV-2856 PLC** |
| | ) | |
| **ARCHDIOCESE OF ST. LOUIS** and | ) | |
| **ASSUMPTION CATHOLIC CHURCH -** | ) | |
| **O'FALLON d/b/a ASSUMPTION PARISH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This case arises from Plaintiff Laurie Zaleuke's claims that her former employers, Defendants Archdiocese of St. Louis and Assumption Catholic Church – O'Fallon ("Assumption Church") discriminated against her on the basis of sex in violation of Title VII of the Civil Rights Act.  [ECF No. 1]  Defendants move for summary judgment arguing that the First Amendment's ministerial exception to employment discrimination laws bars Plaintiff's action.  [ECF No. 62]  Plaintiff opposes the motion.  [ECF No. 74]  For the following reasons, the Court grants Defendants' motion for summary judgment.

### I. Background

Plaintiff was the principal at Defendant Assumption Church's school (hereinafter, "Assumption School"),[1] a Catholic elementary school within Defendant Archdiocese of St. Louis from July 2016 through January 2018.  Father Mitch Doyen was Pastor of Defendant Assumption

---

[1] The summary judgment materials variously refer to Defendant Assumption Church's school as: "Assumption School," "Assumption School – O'Fallon," "Assumption of the Blessed Virgin Mary," and "Assumption of the Blessed Virgin Mary Parish school." [ECF Nos. 64, 65-2, 65-6, 75]  For the sake of consistency, the Court will use the name Assumption School.

Church and Plaintiff's direct supervisor. Fr. Doyen interviewed Plaintiff and offered her the position of principal at Assumption School. [ECF No. 65-1 at 3]

The application Plaintiff completed for the position of principal of Assumption School provided that "[a]ll administrators in Catholic schools MUST BE ACTIVE PRACTICING CATHOLICS" and required applicants to submit a clergy reference letter and signed witness statement. [ECF Nos. 65-3, 76-3 (emphasis in original)] The application also required answers to questions relating to the applicant's religious beliefs and practices, such as: (1) "describe your belief in God and your relationship with Jesus Christ"; (2) "describe your relationship to and involvement in the Catholic Church in general and your parish in particular"; (3) "define the unique mission of Catholic schools"; (4) "describe … the elements of a school's Catholic identity"; (5) "describe your background in religious education" and "[h]ow … this contribute[s] to your work as a Principal/administrator"; and (6) "describe the role for … [a r]eligious leader of the school community…." [Id.]

Along with her application, Plaintiff signed and submitted a two-page document entitled "Witness Statement for Those Who Serve in Catholic Education," which stated:

> The mission of Jesus Christ and the Holy Spirit is the mission of the Catholic Church, to reveal God the Father, Son, and Holy Spirit to all people and to teach them about the fullness of His love. "Indeed the primordial mission of the Church is to proclaim God and to be His witness before the world" (General Directory for Catechesis). The duty and right of educating belongs in a special way to the Church, to which has been divinely entrusted the mission of assisting persons so that they are able to reach the fullness of Christian life (Canon 794 Sec 1)….
>
> **All who serve in Catholic education in the parish and school program, and Catholic Education Office of the Archdiocese of St. Louis will witness by their public behavior, actions, and words a life consistent with the teachings of the Catholic Church. Public speech or public action contrary to the teachings of the Catholic Church promotes scandal, which is a particularly grave offense when given by those who are obliged to teach or educate others (Catechism of the Catholic Church 2285).**

2

Only those persons who can support this Witness Statement are to be employed by pastors, principals and directors/coordinators of religious education.

[ECF Nos. 65-4, 76-4 (emphasis in original)]  The Witness Statement further declared:

All who serve in Catholic education in the Archdiocese of St. Louis should be made aware that support of this Witness Statement must be reflected in their public behavior, including:
- Believing in Jesus Christ
- Engaging in a life of prayer and worship
- Practicing respect and reverence for the dignity of others
- Exercising prudence with confidential information related to work
- Being an active member of his/her Church
- Respecting ecclesial authority

[Id.]  The Witness Statement concluded:  "By my signature below I consent that this [W]itness [S]tatement is incorporated into and forms an integral part of my employment agreement, and further that both shall be interpreted, complied with and enforced pursuant to Canon Law to the exclusion of all other laws."  [Id.]

In June 2016, Plaintiff and Fr. Doyen signed an Elementary Lay Principal Agreement ("Employment Agreement") for the 2016-2017 school year.  [ECF Nos. 65-2, 76-2]  This twelve-month contract required Plaintiff to "perform the duties of Catholic educational leadership in the elementary school in a professional and efficient manner to the satisfaction of the Pastor."  [Id.]  The Employment Agreement further stated that Assumption School "is part of the mission[2] of the

_____

[2] Defendant Archdiocese's 2017 Parish Employee Handbook sets forth the following mission statement :

As Catholics in the Archdiocese of St. Louis, in communion with the Bishop of Rome, we are called by our Lord Jesus Christ to be His Church and live His Gospel.  With joy, we strive to fulfill our Baptismal calling by prayer and worship, teaching and showing our faith, serving others, and fostering unity in diversity.  Guided by the Holy Spirit, we commit ourselves to the responsible stewardship of all God's gifts.

[ECF No. 65-5, 76-5]

Catholic Church therefore the public behavior and statements of [Principal] shall be consistent with the Witness Statement[.]" [Id.]

As principal, Plaintiff met weekly with Assumption Church's director of religious education and Fr. Doyen. [See ECF Nos. 65-7 at 8, 76-8 at 142] She also attended weekly "parish leadership meetings," whose purpose was "to check in with all the different ministries and to have clear communication within the parish." [ECF No. 65-7 at 3] According to Plaintiff, those meetings often involved "talking and probing about our personal spirituality and experiences." [Id.] Fr. Doyen expected Plaintiff to attend "pastoral team retreats" and all-staff prayer days at the beginning of each school year. [Id. at 34-35] Plaintiff also attended, but was not "involved in the planning of[,] First Holy Communion or First Reconciliation or Confirmation…" [Id. at 163]

Plaintiff "worked with the … school administrators of the Archdiocese in [the] area to write the religion curriculum…." [ECF No. 76-8 at 139] At Fr. Doyen's direction, Plaintiff wrote a grant for a three-year plan to "create a caring, safe and Christian environment for all of the stakeholders of the school." [EF No. 65-7 at 9] Plaintiff's plan emphasized "faith formation" and included monthly student body "character/faith rall[ies]" to "celebrate and learn how to deepen our faith…" [Id.]

After Plaintiff's first year as principal, Fr. Doyen completed a "Pastor's Summative Report" assessing Plaintiff's performance. [ECF No. 65-6] Fr. Doyen wrote that Plaintiff "has made remarkable progress in achieving her identified goals of assisting teachers' [sic] in the improvement of instruction" and "cultivated positive relationships with parents, teachers and students." [Id. at 1] Fr. Doyen "encourage[d] [Plaintiff] to remain patient with teachers and staff" and he "especially encourage[d] her to continue in her own faith formation, connecting with a spiritual director monthly." [Id. at 2]

Plaintiff and Fr. Doyen signed a second one-year Employment Agreement in May 2017, renewing the employment relationship for the 2017-2018 school year. [ECF Nos. 65-2, 76-2] At some point during her second year at Assumption School, Plaintiff submitted to Fr. Doyen the following "goal planning form" for the 2018-2019 school year:

> Goal 1: Express a goal which will be a sign of what God is calling you to be in your spiritual journey during this chapter of your life.
>
> Goal: To learn and grow professionally as a spiritual leader in the school community.
>
> Rationale for this goal: It is important that the school community sees me as a spiritual leader and knows that I support them in their journey in building a stronger relationship with Jesus Christ and becoming active participants in the Catholic Church. The parish has a strong [director of religious education] and this is an opportunity for me to work closely with her and to learn from her.
>
> It is important that I stay true to myself and continue the journey that God has called me to do. I believe that I have the knowledge and the tools to create a school where all students are successful and supported. That God has called me to help improve Catholic education and bring students and their families closer to the church and to strengthen their relationships with Jesus Christ. I will continue to grow as the spiritual leader of the school….
>
> Goal 2: Flowing from goal 1, express how you will grow in your commitment to the mission of Assumption Parish; include examples of what that will look like over the next year or two.
> - I will continue to take Paul IV classes[3] and look for other professional development opportunities throughout the year.
> - I took a higher level Paul IV class about St. Francis. I did this to better know him and his message. This gave me a chance to better understand one of the saints that Assumption looks to for guidance. It also gave me the opportunity to build a stronger relationship with [Assumption Church's director of religious education], who is committed to living her life like St. Francis.
> - I will continue to build a relationship with [Assumption Church's director of religious education] and to support her in the faith formation of the school community. I will do this by the following:
>   - I will play an active role in the planning and preparation of all school masses.

---

[3] In her deposition, Plaintiff explained that Defendant Archdiocese "require[d] you to take those … Paul the IV class[es]. So instead of taking a lower-level one, I decided to take a higher-level one, which [ ] was more work…." [ECF No. 76-8 at 165]

        ○   I will play an active role in the faith formation of our students who will be receiving sacraments.

        ….

- Monthly rallies with the students will be centered around living a virtuous life.
- I will read professional books on being a spiritual leader and about the Catholic Church.
- I will continue to work and collaborate with the parish employees and build stronger relationships with them.
- I will be reflective in my own spiritual journey and continue to grow my relationship with Jesus Christ.  I will continue to pray and worship in my private life as well as with the school community.
- I will continue to meet with [Assumption Church's director of religious education] on a weekly basis to collaborate on how to best serve the school community in their faith formation….

[ECF Nos. 65-7 at 4-7; 76-8 at 163]

In his deposition testimony, Fr. Doyen stated that, as principal, Plaintiff was a spiritual leader of the school.  [ECF No. 76-1 at 74]  Plaintiff similarly testified in her deposition that it is "important for a principal to be a spiritual leader[.]"  [ECF No. 76-8 at 164]  However, according to her deposition testimony, Fr. Doyen "wanted [Plaintiff] to focus the first couple years on just being an instructional leader and … on enrollment….," and later "start becoming more of a spiritual leader in the community."  [ECF No. 76-8 at 138-39, 163]

According to Plaintiff's deposition testimony, Fr. Doyen asked to meet with her on January 5, 2018, and he expressed concern about her spiritual leadership and adherence to the Witness Statement.  [ECF No. 76-8 at 134]  When Plaintiff assured Fr. Doyen that she was committed to improving her job performance, Fr. Doyen stated that he would place her on a "growth plan."  [Id. at 137]  Among other things, Fr. Doyen directed Plaintiff to "reach[] out to Dr. Janet Eaton[,] … the best Catholic elementary school principal in the region," and ask Dr. Eaton to mentor her "specifically in Catholic school leadership[.]"  [ECF No. 76-1 at 72]

On January 25, 2018, Fr. Doyen informed Plaintiff that "it was [his] intention not to renew her contract for a third year as principal." [ECF No. 67-1 at 63; see also No. 76-8 at 140] After some discussion, he agreed to accept a letter of resignation. [ECF No. 76-1 at 98]

Plaintiff filed an amended complaint against Defendants alleging that various actions taken by Fr. Doyen violated her rights under Title VII of the Civil Rights Act. [ECF No. 37] In support of her claims, Plaintiff alleged that Fr. Doyen: (1) "was abusing his position and misappropriating Defendant Assumption Parish's funds"; (2) required female but not male employees to participate in unpaid visits to parishioners' homes outside of school hours; (3) excused male employees from attending weekend work retreats but pressured female employees to attend; (4) "altered his behavior toward Plaintiff" and gave her negative performance reviews after she refused to attend a weekend retreat and informed Fr. Doyen about financial irregularities; and (5) "allowed gossip about Plaintiff to continue unabated" and "spread misinformation regarding Plaintiff's departure from Defendant Assumption Parish[.]" [Id.] Plaintiff asserted claims of sex discrimination (Count I), retaliation (Count II), and harassment (Count III) under Title VII of the Civil Rights Act. [Id.]

Defendants move for summary judgment on the ground that the ministerial exception, "grounded in the First Amendment, [ ] precludes courts from entertaining Title VII claims concerning the employment decisions of religious institutions." [ECF No. 63 at ¶ 4] Plaintiff counters that the ministerial exception does not bar her Title VII claims against Defendants because she was an "instructional leader," not a "spiritual leader." [ECF No. 74]

## II.     Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility

of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, the non-movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial."  Id. at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'"  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## III. Discussion

Defendants assert they are entitled to summary judgment on Plaintiff's three Title VII claims because Plaintiff, as school principal, "played an important role in carrying out the school's religious mission" and is therefore subject to the First Amendment's ministerial exception.  [ECF No. 63 at ¶¶ 7-9]  In response, Plaintiff contends that the ministerial exception does not apply to her role as principal because "she was not a religious or spiritual leader" of Assumption School.[4] [ECF No. 74 at 4]

---

[4] The parties do not address separately the application of the ministerial exception to each of Plaintiff's employment discrimination claims.  Instead, the parties appear to accept that if Plaintiff qualifies for the ministerial exception, then it bars all employment discrimination claims, including those that are based on hostile work environment rather than tangible employment actions.  See Demkovich v. St. Andrew the Apostle Par., 3 F.4th 968, 980 (7th Cir. 2021) (ministerial exception bars all hostile environment claims); Skrzypczak v. Roman Cath. Diocese of Tulsa, 611 F.3d 1238,

8

"The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049, 2055 (2020) (quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952)). Independence in matters of governance and "faith and doctrine," however, "does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." Id. at 2060. "[A] component of this autonomy is the selection of the individuals who play certain key roles." Id.

To "ensure[] that the authority to select and control who will minister to the faithful – a matter 'strictly ecclesiastical' – is the church's alone," the United State Supreme Court has recognized a "ministerial exception" to employment discrimination laws.[5] Demkovich v. St. Andrew the Apostle Par., 3 F.4th 968, 975 (7th Cir. 2021) (quoting Hosanna-Tabor Evangelical Church & Sch. v. Equal Emp. Opportunity Comm'n, 565 U.S. 171, 194-95 (2012)). Under the ministerial exception "courts are bound to stay out of employment disputes involving those holding

<hr>

1245-46 (10 Cir. 2010) (same); Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc., No. 1:19-CV-3153 RLY TAB, 2021 WL 3669050, at *7 (S.D. Ind. Aug. 11, 2021). Cf. Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 960 (9th Cir. 2004) (to the extent hostile work environment and retaliatory harassment claims do not involve tangible employment actions, the ministerial exception does not bar those claims).

[5] "The rule appears to have acquired the label 'ministerial exception' because the individuals involved in pioneering cases were described as 'ministers.'" Our Lady of Guadalupe, 140 S. Ct. at 2060. However, the exception is not limited to ordained ministers. See, e.g., id. (applying the ministerial exception to elementary school teachers); Demkovich, 3 F.4th at 968 (guidance counselor); Sterlinski v. Cath. Bishop of Chicago, 934 F.3d 568 (7th Cir. 2019) (organist); Fratello v. Archdiocese of New York, 863 F.3d 190 (2d Cir. 2017) (elementary school principal); Alicea-Hernandez v. Cath. Bishop of Chicago, 320 F.3d 698 (7th Cir. 2003) (communications manager); Starkey, 2021 WL 3669050 (co-director of guidance); Brandenburg v. Greek Orthodox Archdiocese of N. Am., 20-CV-3809 JMF, 2021 WL 2206486 (S.D. N.Y. June 1, 2021) ("sanctified nuns").

certain important positions with churches and other religious institutions." Our Lady of Guadalupe, 140 S. Ct. at 2060.

The Supreme Court declined to adopt a "rigid formula for deciding when an employee qualifies as a minister" for purpose of the exception. Hosanna-Tabor, 565 U.S. at 190. Instead, courts must "take all relevant circumstances into account … to determine whether each particular position implicated the fundamental purpose of the exception." Our Lady of Guadalupe, 140 S. Ct. at 2068. "[A]pplication of the 'ministerial exception' should 'focus on the function performed by persons who work for religious bodies'" and "should apply to any 'employee who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of the faith.'" Id. at 2063 (quoting Hossanna-Tabor, 565 U.S. at 198 (Alito, J., concurring)). In other words, "[w]hat matters, at bottom, is what an employee does." Id. at 2064. See also Fratello v. Archdiocese of New York, 863 F.3d 190, 205-06 (2d Cir. 2017) ("It is the relationship between the activities the employee performs for her employer, and the religious activities that the employer espouses and practices, that determines whether employment-discrimination laws implicate the religious group's First Amendment rights[.]").

Here, although Plaintiff's job title was "lay principal," the record reflects that her primary responsibilities included religious instruction and faith formation in furtherance of Defendants' mission to educate and form students in the Catholic faith. Indeed, the documents memorializing the employment relationship, specifically Defendants' employment application, Witness Statement, and Employment Agreements, "specified in no uncertain terms" that Defendants expected Plaintiff to "help the school[] carry out [its] mission." Our Lady of Guadalupe, 140 S. Ct. at 2066.

Additionally, the summary judgment record reflects that Defendants expected Plaintiff, as school principal, to participate in spiritual leadership. Plaintiff reported directly to Fr. Doyen and attended weekly meetings with Fr. Doyen and Assumption Church's director of religious education, as well as weekly parish leadership meetings "to check in with all the different ministries … within the parish." Fr. Doyen expected Plaintiff to attend retreats for the leadership and pastoral teams, and he testified that the school principal "share[d] the responsibility" of spiritual leadership. In his July 2017 evaluation of Plaintiff's performance, Fr. Doyen advised Plaintiff "to continue in her own faith formation, connecting with a spiritual director monthly." When Fr. Doyen first informed Plaintiff that he had concerns about her job performance in January 2018, his concerns related to Plaintiff "as … a spiritual leader," and the growth plan he assigned her included securing mentorship "specifically in Catholic school leadership." Although not determinative, "the school['s] definition and explanation of [Plaintiff's] role is important." Our Lady of Guadalupe, 140 S. Ct. at 2066.

Likewise, Plaintiff understood that she "would be perceived as a religious leader," Fratello, 863 F.3d at 208, and she believed that her responsibilities as school principal included spiritual leadership. In fact, Plaintiff affirmed in her deposition that "it is important for a Catholic school principal to be a spiritual leader." In her goal planning form for the 2018-2019 school year, Plaintiff's first goal was to "learn and grow professionally as a spiritual leader in the school community." Plaintiff explained: "It is important that the school community … knows that I support them in their journey in building a stronger relationship with Jesus Christ and becoming active participants in the Catholic Church." Plaintiff identified specific steps for developing her spiritual leadership, which included taking religious education classes, building her relationship

with Defendant Assumption Parish's director of religious education, planning monthly rallies "centered around living a virtuous life," and reading professional books on being a spiritual leader.

Most significantly, the summary judgment record demonstrates that Plaintiff performed "important religious functions" for Defendants. See Fratello, 863 F.3d at 208 (citing Hosanna-Tabor, 565 U.S. at 192). For example, Plaintiff, along with other Catholic school administrators, wrote Defendants' religion curriculum. Plaintiff also wrote a grant, which Fr. Doyen approved, for Defendants "to create a caring, safe and Christian environment" focused on faith formation to "support and guide [students] on their journey to deepen their faith and their relationship with God and to achieve at high levels." Furthermore, Defendant Archdiocese required Plaintiff to take Paul IV classes. "[T]he academic requirements of a position may show that the church in question regards the position as having an important responsibility in elucidating or teaching the tenets of the faith." Lady of Guadalupe, 140 S. Ct. at 2064.

Plaintiff diminishes the religious nature of her role as principal, arguing that she "was not a spiritual leader at the time of her employment, but it was the hope that [she] would grow into one." [ECF No. 74] Plaintiff emphasizes her secular duties and states that Fr. Doyen directed her to focus on instructional leadership her first two years as principal. Plaintiff's argument, however, "disregards that the school 'clearly intended for [her] role to be connected to the school's [Catholic] mission." Starkey, 2021 WL 3669050, at *6 (quoting Grussgott v. Milwaukee Jewish Day Sch., Inc., 882 F.3d 655, 660 (7th Cir. 2018)). Even if Defendants intended for Plaintiff to later assume a greater role in the school's spiritual leadership, the record establishes that, during the relevant time period, Defendants considered Plaintiff to be a spiritual leader in the school community and she performed work related to Defendants' religious mission. The Court therefore finds that the ministerial exception applies to Plaintiff.

**IV.     Conclusion**

In short, the record on summary judgment establishes that Plaintiff and Defendants considered Plaintiff a spiritual leader of the school and she performed important religious functions to advance Defendants' Catholic mission.  See <u>Fratello</u>, 863 F.3d at 209.  The Court therefore finds that the ministerial exception bars Plaintiff's claims of employment discrimination.

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment [ECF No. 63] is **GRANTED** and Plaintiff's Counts I, II, and III are **DISMISSED** with prejudice.

A separate judgment in accordance with this Order and Memorandum is entered this same date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of November, 2021